**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Douglas James Sellner

                    Plaintiff,

          v.

MAT Holdings, Inc.,
Midwest Air Technologies, Inc.,
MAT Industries LLC, and
Sanborn Manufacturing Company,

                    Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 13-1289 ADM/JJK

---

Stephen W. Cooper, Esq., and Stacey R. Everson, Esq., The Cooper Law Firm Chartered, Minneapolis, MN, on behalf of Plaintiff.

Bradley J. Lindeman, Esq., George H. Norris, Esq., Laura C. Sands, Esq., Margaret R. Ryan, Esq., Meagher & Geer, Minneapolis, MN, on behalf of Defendants.

---

# I. INTRODUCTION

On May 5, 2015, the undersigned United States District Judge heard oral argument on Defendants MAT Holdings, Inc., Midwest Air Technologies, Inc., MAT Industries, LLC, and Sanborn Manufacturing Company's (collectively, the "Defendants") Motion for Summary Judgment [Docket No. 157] and Motion to Exclude Expert Testimony [Docket No. 148] and Plaintiff Douglas Sellner's ("Sellner") Motion to Exclude Expert Testimony [Docket No. 175]. In his Complaint [Docket No. 1-1], Sellner, a former MAT Industries, LLC ("MAT Industries") employee, alleges that MAT Industries wrongfully terminated him in violation of the Minnesota Whistleblower Act. For the reasons stated herein, Defendants' Motion for Summary Judgment is granted.

## II. BACKGROUND

### A. Parties

MAT Holdings, Inc. ("MAT Holdings") is a privately-held company owned by Steve Wang with six subsidiary companies within the United States, including Defendants Midwest Air Technologies, Inc. and MAT Industries. Ryan Decl. [Docket No. 162] Ex. 1; Ex. 2 ("Thomas Dep.") 8–10. MAT Holdings performs certain human resource and administration work related to MAT Industries, and MAT Industries pays a monthly management fee to MAT Holdings for these services. Ryan Decl. Ex. 8 ("Nebel Dep.") 9–10. MAT Industries is in the business of marketing air compressors, pneumatic driven air tools, and pressure washers, which are sold at multiple retailers and home centers. Thomas Dep. 198.

In 2008, MAT Industries purchased a facility in Springfield, Minnesota. Ryan Decl. Ex. 4 ("Beckman Dep.") 61. The Springfield facility was previously owned by Sanborn Manufacturing. MAT Industries refers to the facility as "Sanborn Mfg., a division of MAT Industries, LLC" ("Sanborn"), however Sanborn is not itself a legal entity. Ryan Decl. Ex. 33, fn.1. Paul Thomas serves as MAT Industries' Chief Operating Officer and Butch Stark is Sanborn's General Manager. Thomas Dep. 7; Ryan Decl., Ex. 3 ("Stark Dep.") 14.

### B. 14CFM Pumps

Sanborn makes air compressors ("compressors") with oil-lubricated, single-stage, three-cylinder, 14 cubic-feet-per-minute pumps (the "14CFM pumps"). Beckman Dep. 65–68. The compressors operate by a motor driving the pump, which then injects air into a pressure vessel tank. The tank then stores the compressed air. Strong Decl. [Docket No. 171] ¶ 2. The amount of air within the tank is controlled by a pressure switch which turns the compressor on and off.

Ryan Decl., Ex. 15 ("Swanson Dep.") 52–53.

MAT Industries manufactures the tank vessels at Sanborn and purchases the remaining compressor components from third parties. Beckman Dep. 60. In 2007, Sanborn started selling compressors with 14CFM pumps purchased from a third-party vendor. Ryan Decl. Ex. 5 ("Strong Dep.") 317–19; Beckman Dep. 65–67. However, due to delivery and quality issues related to the vendor, MAT Industries started purchasing 14CFM pumps from Suzhou Honbase Machinery Manufacture Co. ("Honbase"). Beckman Dep. 67–68. Honbase is now the primary supplier of 14CFM pumps (the "Honbase pump") for Sanborn. Strong Dep. 93. Honbase is also owned by Steve Wang, owner of MAT Holdings and its subsidiaries. Beckman Dep. 67–68.

## C. Testing and Issues Related to the Honbase Pump

MAT Industries' specifications for the 14CFM pump called for one compression ring and one oil ring. Beckman Dep. 75. Honbase, however, modified the specifications and did not include a compression ring in their design. Id. at 180–81. MAT Industries was aware that Honbase made such modifications, but did not immediately direct Honbase to add the compression ring component. Strong Dep. 97, 128.

MAT Industries experienced problems with the Honbase pump, including difficulties with oil consumption and leakage. Strong Dep. 92, 97. During the course of their work on various compressors, laboratory technicians at Sanborn conducted internal performance and life span testing on the equipment. Beckman Dep. 38–41. The performance tests measured the CFMs achieved by the compressor and life span testing accelerates the supposed life span of the compressor to identify weaknesses. Ryan Decl., Ex. 18 ("Sellner Dep.") 120; Beckman Dep. 42. The internal goal for the 14CFM pump was 14CFM at 90 pounds-per-square-inch ("PSI") and

1500 hours of life span testing.  Beckman Dep. 71.

Kurt Beckman, Sanborn's Engineering Manager, commenced Test Request 136 ("TR136") on December 8, 2010.  Defs.' Ex. 21.  Test Request 136 conducted performance and life tests for five Honbase pumps.  Id.  When the tested pumps did not achieve the CFM goal, MAT Industries directed Honbase to continue to work on reducing the pump's oil consumption.  Ryan Decl. Ex. 26.

**D.  MAT Industries Hires Sellner**

In June 2011, MAT Industries hired Plaintiff Sellner as a lab-quality technician for the Sanborn facility.  Ryan Decl. Ex. 7.  Sellner understood that he was an at-will employee.  Sellner Dep. 104.  Sellner's primary responsibility was to conduct testing in the Sanborn testing lab, to collect corresponding testing data, and report the data to engineers and supervisors.  Ryan Decl. Ex. 30, Interrog. No. 9.  These reporting obligations included Sellner's observations of safety, vendor quality, and manufacturing issues.  Id.  Travis Strong, MAT's Quality Assurance and Product Service Manager, was Sellner's direct supervisor.  Strong Dep. 9; Sellner Dep. 114.

On Sellner's first day at Sanborn, Strong reported to Sellner that the Honbase pumps had serious problems with oil leakage during testing.  Sellner Decl. [Docket No. 184] ¶ 3.  Sellner observed oil leaking to the floor, as well as oil spitting from the pump units during the pump testing process.  Id.

**E.  Sears and Performance Testing**

In August 2011, MAT Industries and Sears began working together to add a compressor with the Honbase pump to Sears' Craftsman product line.  Ryan Decl. Ex. 31.  Paul Thomas, MAT's Chief Operating Officer, and Chris Clare, MAT's National Sales Manager, requested

that test data on the Honbase pump be compiled for Sears' Engineering Manager Dan Swanson. Ryan Decl. Exs. 31–32, Ex. 33, Interrog. No. 2; Swanson Dep. 13. On August 22, 2011, Clare sent the raw performance and life test data from TR136 to Swanson. Ryan Decl. Ex. 24.

On August 23, 2011, Beckman commenced Test Request 321 ("TR321"). Ryan Decl. Exs. 34–38. TR321 evaluated whether changes implemented by Honbase improved oil consumption and life performance in the Honbase pump. Sellner was assigned to complete TR321, with results to be completed in January 2012.[1] Ryan Decl. Exs. 39, 40.

On September 9, 2011, Clare sent an Executive Summary of TR136 to Sears. Ryan Decl. Ex. 48. According to Defendants, the Executive Summary reported identical performance data and oil consumption to the raw data recorded during the course of the testing. Compare Ryan Decl. Ex. 49 with Ex. 24. The summary noted several minor issues in the raw life test data, but did not identify any "major issues." Ryan Decl. Ex. 48. The summary did, however, recommend several improvements. Id.

In January 2012, MAT initiated Test Request 407 ("TR407"), designed to determine whether adding a compression ring to the Honbase pump would reduce oil leakage. Ryan Decl. Ex. 53–54. Sellner was also assigned to conduct TR407. Id. TR407 revealed that using a compression ring reduced the amount of oil leakage in the Honbase pump. Strong Dep. 144–45; Ryan Decl. Ex. 58. Based on this finding, MAT Industries notified Honbase that the ring configuration on the Honbase pump must include a compression ring. Ryan Decl. Exs. 59–66.

On February 15, 2012, Swanson requested that MAT Industries provide Sears with

---

[1] In his Declaration, Sellner states that TR321 tested 60-gallon units, however the test results prepared by Sellner state that 80-gallon units were utilized.

further performance and life testing data on the Honbase pump.  Ryan Decl. Ex. 70.  Clare

forwarded Swanson's request to Stark.  Id.; Stark Dep. 128.  Because Stark had never prepared

reports for Sears, Clare sent Stark several previous reports as examples.  Stark Dep. 128.  The

examples included a form titled "Compressor Test Report" and Clare requested that Stark utilize

a similar format when compiling the report for Sears.  Ryan Decl. Ex. 72.

       Knowing that Sellner had been assigned TR321, Stark asked for Sellner's assistance in

responding to Sears' request for additional data.  Stark Dep. 124–125.  Defendants claim that

Sellner sent Stark a February 28, 2012 Quality Department Laboratory Report on TR321 (the

"Quality Report") that stated:  (1) tests showed units passed performance and life testing

benchmarks; and (2) units passed with minor [n]ormal service issues.  Ryan Decl. Ex. 45.  The

Quality Report detailed that all compressor units tested achieved the desired 14CFM and

exceeded 1500 hours of life testing.  Id.  Defendants contend that the life test data in the Quality

Report accurately reflects the raw life test data on TR321 listed on a spreadsheet created by

Sellner on February 28, 2012.  See Ryan Decl. Ex. 76.  Sellner, however, asserts that the Quality

Report does not truthfully reflect the actual testing data for TR321 and that he did not prepare

the report.  Supp. Sellner Decl. [Docket No. 206–1] ¶ 4 ("Not only does this Report fail to

truthfully reflect the actual testing data, but it also falsely purports to have been prepared by me.

In this Report, just as in the false 3/6/2012 Report Defendants submitted to Sears, they re-

numbered the compressor units I tested, i.e., the compressor units Defendants identify as Units 7

through 11 in their Reports, reflects Units 1 through 5 from my testing.").

       Stark took the information from the Quality Report and prepared a Compressor Test

Report ("CTR") consistent with testing formats previously sent to Sears.  Ryan Decl. Exs. 77,

79.  The CTR summarized that TR321 tested 80-gallon units and concluded that the "pump test

samples exceeded minimum [l]ife test requirement set by customer."  Ryan Decl. Ex. 79.  On

March 6, 2012, Stark forwarded the CTR to Sellner, requesting that Sellner and another

colleague "go through the data I have entered to make sure that I haven't made any mistake."  Id.

Sellner responded by email the same day with two edits.  Ryan Decl. Ex. 42.  Although Sellner

recalls writing the email, he disputes that the email was sent on March 6.  Sellner Dep. 228–30.

The CTR was sent to Swanson at Sears on March 7, 2012.  Ryan Decl. Exs. 82, 83.  The

life test data included in the CTR sent to Sears was identical to the data in the CTR report

allegedly edited by Sellner on March 6.  Compare Ryan Decl. Ex. 82, with Ex. 42.  Sellner

contends that the data sent to Sears in the CTR does not accurately reflect the TR321 test results.

Supp. Sellner Decl. ¶ 3; Sellner Dep. 236.

## F.  Miller's Positive Job Review and Issues in the Sanborn Lab

On March 5, 2012, Sellner received a positive job evaluation from his immediate

supervisor, Strong:

> Doug came on board June 1st as a Quality Technician.  Doug has brought vast
> intellectual knowledge and experience across all facets.  With Doug's
> Engineering background, he has been the primary owner of the process of
> diagnosing and troubleshooting the new Lab life test cells, and data acquisition
> program.  Doug has almost solely been keeping the life test units clocking life
> hours.  Doug's quality and manufacturing experience pin pointed a thread leak
> issue, as a truncation issue.  The problem has intermittently surfaced on numerous
> occasions across different suppliers.  Doug designed and fabricated a go/no-go
> gauge to identify the problematic parts before they reach production.  Later, the
> supplier requested to duplicate his gauge and has incorporated it into their
> production inspection process.  Doug has participated in several DOE's
> conducted in the Lab to help raise CFM performance and reduce oil consumption.
> Doug has streamlined the performance test cell and improved its accuracy.  He
> has begun to restore organization to the test data by establishing a hard filing
> system.  With Doug's previous Lab experience, he understands the importance of
> calibration, and the ability to repeat measurements.  Doug volunteered to learn

strain gauging and sought out additional training from the strain gauge system supplier, Vishay Precision Group. The strain gauge system was basically inoperable from the course of the last five years. Doug has been able to diagnose, and is close to bringing the system back on line, while saving thousands of dollars in card calibrations.

Defs.' Ex. 84; Pl.'s Ex. E.

In the Spring of 2012, tension in the lab was escalating. See Ryan Decl. Ex. 85. On March 7, 2012, Josh Beach, a lab technician, sent Stark and Strong an email expressing his frustration about the working environment in the lab, specifically noting that Sellner and Clyde Knadel, a lab technician, were "at each other's throats all day here so far and they are dragging me into the situation." Id. In response, Stark met with Sellner, Knadel, and Beach and emphasized that they all needed to get along and have a productive working relationship. Ryan Decl. Ex. 86 ("Beach Dep.") 45.

In mid-March of 2012, Sellner was assigned to accompany Strong to China to evaluate Honbase's operations and implement improvements in the Honbase pump. Defs.' Ex. 87, 88–92. Sellner and Strong were scheduled to depart on April 3, 2012. Ryan Decl. Ex. 88.

**G. Request to Falsify Data**

On March 29, 2012, Sellner alleges that Stark instructed him "to get together everything [they] had on the [Honbase] pump." Sellner Dep. 125-26; 149. Accordingly, Sellner "updated the life test" by collecting all relevant testing results and entering the results into a spreadsheet. Id. at 149. Sellner then delivered the data to Stark both in hardcopy and email form. Id.

According to Sellner, later that same day, the Engineering Lab Manager Joe Schiller, entered his office with a copy of the spreadsheet Sellner had made earlier and stated that the testing results were "shit" and that he could not use them in any summary report for Sears. Id. at

150–51.  Shortly thereafter, Sellner alleges that Stark entered his office and claimed that Sears had called MAT Industries "on the carpet" because they had overstated the performance and quality on the Honbase pump.  Id. at 150.  Stark instructed Sellner to produce a report indicating that the units did not have major issues and adequately passed life tests of 1,500 hours.  Id. at 151.  Sellner claims that when he told Stark that no units performed to these specifications, Stark responded "well, if you don't do this, we're all going to be on the street—no, you're going to be on the street."  Id.  Sellner states that when he told Stark that he would not falsify any testing records, Stark urged him to "get creative with [his] documentation."  Id.

Beach asserts that he overheard portions of this conversation between Sellner and Stark.  Specifically, Beach recalls that Stark stated that Sears was "calling them on the carpet" for overstating performance and that Stark encouraged Sellner to get creative with testing documentation and Sellner refused.  Beach Dep. 130–31, 146–47.  Beach further claims that after the conversation with Stark, Sellner stated "Well, there's my job."  Id. at 147.

According to Sellner, Stark returned that day to his office with a copy of an "Executive Summary Report" and directed Sellner to put his report in that format.  Sellner Decl. ¶¶ 24, 25.  Sellner claims that this Executive Summary Report of TR136 should have reflected the actual testing data from TR136 but instead it falsely stated that there were no "major issues" with the pump and that it "passed" all testing.  Sellner Decl. ¶ 27.  Stark additionally showed an email to Sellner authored by Swanson pressuring MAT Industries for data:  "Where's my 80 gallon 3 cylinder life test data?  What is the holdup.  Please send all the data on all the 3 cyl compressors you tested. . . .  There are people breathing down my neck!!!!!"  Id. ¶ 28; Everson Decl. [Docket No. 191] Ex. Z.  In reference to the email, Stark allegedly told Sellner "this is what we're up

against." Sellner Decl. ¶ 28.

Sellner states that Stark continued to return to his office throughout the day on March 29, pressuring him to complete an Executive Summary report with falsified data. Sellner refused. Id. ¶ 30. Stark's pressure continued the next day, with Stark instructing Sellner to use go-cart data for the Executive Summary.[2] Id. ¶ 39. Again, Sellner responded that this would not be inappropriate. Id. On that same day, March 30, 2012, Sellner called the Minnesota Department of Labor and Industry ("MNOSHA"). Beach reports that he was in the room with Sellner when he made the call, and that Sellner reported that he was instructed to "doctor up some documentation." Beach Dep. 49; Sellner Dep. 274–75. Sellner subsequently completed and submitted a MNOSHA form online. Sellner Decl. ¶ 40.

## H. Promotion and China Trip

MAT Industries posted a Quality Assurance/Test Lab Leadperson position opening on March 30, 2012. Ex. 97. Strong Dep. 42.[3] After interviewing Sellner, Strong recommended that Sellner be promoted and Stark approved. Stark Dep. 43–44, 47. Sellner learned of his promotion just prior to his departure for China on April 3. Sellner Dep. 159.

On April 2, 2012, Sellner alleges that he received a call from Swanson regarding Honbase pump data. Specifically, Swanson desired life testing data for the Honbase pump that did not reflect any major issues. Id. 205–06. Sellner responded that there was no such data in existence. Id. Swanson then told Sellner that MAT Industries "should have worked the bugs out

---

[2] "Go-cart" data came from enhanced units with CFM pumps that were altered or tweaked for experimentation purposes. Pl.'s Mot. Opp'n Summ. J. [Docket No. 190] 16.

[3] Knadel and another Sanborn employee, Cliff Streich, also applied for the position, but were not interviewed. Beach Dep. 187–188.

before it was presented to Sears" and hung up.  Id. at 208.  Swanson has no recollection of this conversation with Sellner.  Swanson Dep. 183–84.

Sellner and Strong left for China the next day on April 3, 2012.  Sellner Dep. 123.  While on the plane, Sellner claims that he told Strong about Stark's instruction to provide a falsified report for Sears.  Sellner Decl. ¶ 44.  Strong responded "It would be best if I didn't hear about this" and put up his hand as if to gesture to Sellner to stop talking when Sellner attempted to continue the discussion.  Id.  Strong denies Sellner ever told him about the data falsification request.  Strong Dep. 219–20.  While in China, Sellner discovered issues with the manufacturing process for the Honbase pump, including faulty pump testing equipment that had never been accurately calibrated.  Sellner Decl. ¶ 9.

## I.  Investigation of Sellner

On April 10, 2012, while Sellner was still in China, Janis Nebel, the corporate Director of Human Resources at MAT Holdings, received an anonymous email accusing Sellner of inappropriate conduct and voicing concern that Sanborn had not done anything to address his behavior.  Ryan Decl. Ex. 99; Nebel Dep. 6.  The email requested that a corporate representative conduct an investigation.  Ryan Decl. Ex. 99.

On April 16, 2012, Sellner returned from China.  That same day, Strong recommended that Sellner receive an above standard pay increase for the lead position, citing that Sellner "brought vast intellectual knowledge and experience across all facets."  Ryan Decl. Ex. 100. Strong and Stark both signed the paperwork proposing the pay increase.  Ryan Decl. Ex. 101.

The next day, on April 17, 2012, Sellner noticed that his notebook was missing and believed that someone had been in his Hotmail email account.  Sellner Decl. ¶ 47.  Sellner claims

he received an email that same day from Stark directing him to complete an attached report, but when Sellner opened the attachment the report was already completed.  Sellner examined the report and determined that it did not properly reflect the TR321 data.  Id.  Beach reported to Sellner that Knadel and Stark had been in Sellner's office while he was in China and that Knadel had taken Sellner's notebook.  Id. ¶ 48.

On April 17, 2012, Sellner spoke with engineer Ryan Schwartz about the changes Sellner planned for the lab, including his plan to move Knadel out of the lab.  Schwartz Dep. 241–42.  During the course of this conversation, Schwartz told Sellner that he "fucked it up for everyone" and that Sellner "should enjoy his time at Sanborn."  Sellner Dep. 164.  Sellner reported these comments to Stark.  Id. 165.  Later, Beach asked Schwartz what he meant by this comment.  Beach Dep. 147.  According to Beach, Schwartz said "it was all about the [Honbase pump], and that it was going to drag everybody through the mud, and we were all going to end up losing the Sears contract, and nobody would have a job anymore."  Beach Dep. 147–48.

Later that day, a meeting was attended by Sellner, Schwartz, Stark, and Sanborn's HR director, Vonda Carnell.  Ryan Decl. Ex. 6 ("Carnell Dep.") 173.  Schwartz voiced complaints at the meeting regarding Sellner's derogatory remarks relating to women.  Schwartz claimed Sellner had called a female coworker a "cunt" and commented on a coworker's feminine odor.  Sellner Dep. 166-68; Carnell Dep. 173–74.

On April 18, 2012, Carnell and Stark began interviewing several employees to investigate the concerns raised by Schwartz in the April 17 meeting.  Knadel reported that Sellner commented on a female coworker's feminine odor, called a female employee a "fucking cunt," referred to female employees who worked in the switch area as "switch bitches,"

commented on female employees' "camel toe," and made comments related to how many fingers could fit in female employees' vaginas. Knadel Dep. 375–80. Sellner was also interviewed and claimed that Knadel was trying to set him up to be fired and countered that Cliff Streich, a quality inspector, had stated that a female manager had "gis up her cunt." Ryan Decl. Exs. 102, 104.

On April 19, 2012, Schwartz emailed Nebel and notified her that he had complained to Carnell and Stark about Sellner's behavior. Ryan Decl. Ex. 105. Schwartz requested that someone from corporate be involved with investigating his complaint. Id. Nebel discussed the matter with Thomas and her supervisor and it was decided that the situation should be investigated at Sanborn. Am. Everson Decl. Ex. 2 ("Pl.'s Nebel Dep.") 80. Nebel visited Sanborn from April 23 through April 25. Nebel did not specifically seek out witnesses, but rather let individuals come to her. Id. at 72–74.

During the course of Nebel's investigation, Schwartz and Knadel voiced complaints regarding Sellner similar to those they originally directed to Carnell and Stark. Ryan Decl. Ex. 30, Interrog. No. 3. Other employees raised issues of how Sellner interacted with coworkers, including how he criticized others and was abrasive. Id. These issues included complaints of Sellner being difficult to work with, disregarding safety precautions, and having a condescending attitude toward other employees. Id.

Sellner and Nebel met on April 25. Sellner Dep. 202. During the meeting, Sellner told Nebel that he was facing retaliation because the engineering department had lost control of the lab. Id. 177. Sellner also accused Knadel of sleeping in the lab and falsifying test documents. Id. According to Sellner, he also reported to Nebel that he was asked to "fudge test results out of

the lab when the units were failing to save the Sears contract." Id. 222. Nebel, however, stated she did not remember Sellner reporting the falsification requests to her. Nebel Dep. 64. On April 20, Sellner sent Strong an email recounting an incident in which Knadel had looked at a picture of Sellner's sixteen-year-old daughter and commented that she could make one thousand dollars a day in Las Vegas. Ryan Decl. Ex. 107.

**J. Sellner's Termination**

When she returned to her office on April 26, Nebel reported to Thomas that "there was an unproductive work environment now that probably was irreversible" at Sanborn. Thomas Dep. 180. Thomas called Strong to ask if he had ever heard Sellner make inappropriate comments about women. Thomas Dep. 178. Strong responded that Sellner had told him on their China trip that "in Italy they gauge females on how many fingers you can fit between their legs." Strong Dep. 28. Thomas then spoke with both Strong and Stark and it was decided that Sellner would be terminated. Thomas Dep. 181. Sellner received notice of his termination that day. Sellner Dep. 246. MAT Industries maintains that Sellner was terminated for his "unacceptable conduct" including "inappropriate and offensive statements made to and about his colleagues, an inability to maintain positive and productive relationships with his co-workers, and engaging in conduct that adversely affected the productivity of the workplace." Ryan Decl. Ex. 30, Interrog. No. 1.

**K. Other Incidences of Misconduct at MAT Industries**

After MAT Industries terminated Sellner, a sexual harassment complaint arose at a plant in Georgia. Nebel Dep. 119. A female employee filed a complaint with the Georgia Department of Labor alleging that two male employees made inappropriate comments about another female

employee.  One of the male employees said, "Oh, wow, I would do her twice on Saturday night."

Id. at 120.  The incident was investigated by the Georgia Department of Labor and the on-site

management.  Id. at 119.  The two male employees admitted making the statements but were not

terminated.  Id. at 124–25.  All employees at the plant subsequently completed formal sexual

harassment training.  Id. at 119.  No corporate employees traveled to the Georgia plant to

conduct an investigation.  Id. at 123–24.

Also after Sellner's termination, Nebel investigated an allegation of employee

misbehavior at a warehouse in California.  Id. at 31–32.  One employee alleged that a coworker

was using illegal drugs in the workplace and failing to complete her job duties.  Id. at 32–33.

The investigation showed that these allegations were false, and no discipline was carried out.  Id.

at 33–34.

**L.  The Instant Action**

Sellner commenced this lawsuit on May 29, 2013, alleging claims for (1) wrongful

termination under the Minnesota Whistleblower Act, Minn. Stat. § 181.932; (2) defamation; (3)

international interference with an economic advantage and/or contract; (4) breach of contract; (5)

negligent supervision, negligent training, negligent retention, and negligent hiring; and (6)

negligence.  Sellner later amended his claim to assert punitive damages.

Defendants now move for summary judgment.  The parties have additionally each filed motions

to exclude expert testimony.

**III.  DISCUSSION**

**A.  Motion for Summary Judgment**

**1.  Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The United States Supreme Court, in construing Federal Rule 56(c), stated in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. <u>Ludwig v. Anderson</u>, 54 F.3d 465, 470 (8th Cir. 1995). However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." <u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate. <u>Id.</u> However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment. . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" <u>Get Away Club, Inc. v. Coleman</u>, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted). Moreover, a plaintiff facing a summary judgment motion cannot "get to a jury without any significant probative evidence tending to support the complaint." <u>Rath v. Selection Research, Inc.</u>, 978 F.2d 1087, 1091 (8th Cir. 1992), (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). In addition, "summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence that might tend to support a complaint." <u>Krenik</u>, 47 F.3d at 959.

## 2. Whistleblower Claim

Sellner's retaliation claim under the Minnesota Whistleblower Act ("MWA") will be first

addressed.[4]

### a. Retaliation Claims Under the MWA and Direct Evidence

Pursuant to the MWA:

> [a]n employer shall not discharge, discipline, threaten, otherwise discriminate
> against, or penalize an employee regarding the employee's compensation, terms,
> conditions, location, or privileges of employment because:
>
>> (1) the employee . . . in good faith, reports a violation or suspected
>> violation of any federal or state law or rule adopted pursuant to law to an
>> employer or to any governmental body or law enforcement official. . . .
>>
>> (3) the employee refuses an employer's order to perform an action that the
>> employee has an objective basis in fact to believe violates any state or
>> federal law or rule or regulation adopted pursuant to law, and the
>> employee informs the employer that the order is being refused for that
>> reason. . .

Minn. Stat. § 181.932, subds. 1, 3. Retaliation claims asserted under the MWA may be proven

by direct evidence or, in the absence of direct evidence, analysis under the McDonnell Douglas

burden-shifting structure.[5] Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

"'[D]irect evidence is evidence showing a specific link between the alleged discriminatory

animus and the challenged decision, sufficient to support a finding by a reasonable fact finder

that an illegitimate criterion actually motivated the adverse employment action.'" Id. (quoting

---

[4] Prior to arguing the merits of Sellner's claims, Defendants contend that MAT Holdings, Midwest Air Technologies, Inc., and Sanborn are not properly named as parties in this lawsuit. Defendants contend MAT Industries was Sellner's exclusive employer, and therefore, it is the only proper Defendant. Because Defendants' Motion for Summary Judgment will be granted as explained below, whether certain Defendants are properly named is irrelevant.

[5] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)). "'Direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." Griffith, 387 F.3d at 736.

Sellner argues that he has sufficiently produced direct evidence of retaliation. In support of this contention, Sellner claims that to fulfill MAT Industries' instructions to Sanborn to produce data on the Honbase pump to retailers, he was asked to falsify reports and when he refused to do so on March 29, 2012, Stark responded that he would "be on the street" if he did not comply. Sellner additionally states that Defendants continued to pressure Sellner to produce false data until April 16, 2012 and then commenced a pretextual investigation of him on April 17, 2012.

The Court disagrees that these events constitute direct evidence of retaliation in this context. The record does not support a finding of a "specific link" between Sellner's termination and Stark's alleged "on the street" threat and alleged continued requests to falsify reports.

Stark's comment was allegedly made on March 29, 2012, approximately a month before Sellner's termination. Courts have previously found such statements too remote in time to be classified as direct evidence. See Fjelsta v. Zogg Dermatology, PLC, 488 F.3d 804, 810 (8th Cir. 2007) (finding that where there was no other evidence linking a comment to an adverse employment action that occurred over a month later, the comment was considered a stray remark and not direct evidence). Even if the requests to produce data continued until an investigation was initiated in mid-April, as Sellner alleges, this still falls short of demonstrating direct evidence solely due to temporal proximity. For example, in Young-Losee v. Graphic Packaging Intern., Inc., temporal proximity served as direct evidence of retaliation when the plaintiff's supervisor, after receiving a formal complaint of harassment, "wadded up her complaint, called it 'total bullshit,' threw it in the garbage can, told her to leave, and said he never wanted to see her

again." 631 F.3d 909, 912 (8th Cir. 2011). In comparison, Stark's alleged comment and requests to "get creative" with documentation for Sears are too attenuated to Sellner's termination on April 26, 2012.

Moreover, the intervening actions taken by Sellner's superiors between Stark's March 29 comment and Sellner's termination belies any finding of a specific link to constitute direct evidence. Indeed, these actions confirm that Sellner's superiors at Sanborn, including Stark, were pleased with the technical aspects of his work performance. After Stark commented that Sellner would be "out on the street" if he failed to produce a report for Sears to Stark's satisfaction, Stark approved Sellner's promotion to the lead lab position in early April. Additionally, Sellner accompanied Strong to Honbase in China. Strong specifically noted that Sellner's selection for the China trip was to evaluate whether "he'd be able to handle . . . the next trips on his own." Strong Dep. 218. Upon his return from the trip, Sellner received an above standard pay increase, approved by both Strong and Stark, thus indicating that Sellner's supervisors were pleased with his performance in China and invested in his future at Sanborn and with MAT Industries. These intervening actions disrupt any causal connection or specific link between the comment and the eventual termination. See Pedersen v. Bio-Medical Applications of Minn., 775 F.3d 1049, 1054 (8th Cir. 2015) (finding a supervisors comments regarding ways to "get rid" of plaintiff months prior to the termination occurring was not direct evidence due to intervening events, including the employer allowing the plaintiff to return to work on a corrective action plan). Accordingly, Sellner has failed to present direct evidence of retaliation.

### b. McDonnell Douglas Analysis

Absent direct evidence of retaliation, the Court applies the McDonnell Douglas burden-

shifting framework to resolve claims under the WMA. <u>SatCom Mktg., LLC</u>, 705 F.3d at 828. Under <u>McDonnell Douglas</u>, the plaintiff maintains the initial burden of establishing a prima facie case of retaliation. <u>Pedersen</u>, 775 F.3d at 1054 (quoting <u>Buytendorp v. Extendicare Health Servs., Inc.</u>, 498 F.3d 826, 834 (8th Cir. 2007)). "A prima facie case consists of (1) conduct by the employee that is protected by the [Act], (2) an adverse employment action directed at the employee, and (3) a causal connection between the protected conduct and the adverse action." <u>Buytendorp</u>, 498 F.3d at 834. If a plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to "articulate a legitimate reason for the adverse action." <u>Id.</u> "Once the employer has articulated a legitimate reason, the plaintiff shoulders the ultimate burden of establishing a whistleblower violation by demonstrating that the employer's 'reason is merely a pretext and that retaliatory animus motivated the adverse action.'" <u>Hilt v. St. Jude Med. S.C., Inc.</u>, 687 F.3d 375, 378–79 (8th Cir. 2012) (quoting <u>Buytendorp</u>, 498 F.3d at 834)).

There is no dispute that Sellner suffered an adverse employment action—he was terminated from his position with MAT. Defendants contest the other two elements of the prima facie case—that Sellner engaged in protected conduct under the MWA and that there was a causal connection between any such conduct and his termination.

"Yet, when an employer has proffered the legitimate, non-retaliatory reason required at step two of <u>McDonnell Douglas</u>, the Court may skip the prima facie case and move directly to the question of discrimination *vel non*." <u>Hilt v. St. Judge Medical S.C., Inc.</u>, Civ. 10-987, 2011 WL 2682889, at *6 (D. Minn. July 11, 2011) <u>aff'd</u>, 687 F.3d 375 (8th Cir. 2012) (citations omitted). Here, Defendants have provided an alternative reason for Sellner's termination; "Sellner's unacceptable and inappropriate conduct, and adverse impact on the productivity of the workplace." Ryan Decl. Ex. 30, Interrog. No. 3. Courts have previously categorized similar

proffered reasons as legitimate and non-retaliatory.  See Brown v. City of Jacksonville, 711 F.3d

883, 893–94 (8th Cir. 2013) (finding that employer had offered a legitimate non-retaliatory

reason for a termination when the employer's behavior toward other employees created a hostile

work environment); Chivers v. Wal-Mart Stores, Inc., 641 F.3d 927, 934 (8th Cir. 2011) ("We

have found that 'an employer's belief that the employee committed misconduct' is a legitimate,

non-retaliatory reason for the employer's action" (quoting Richey v. City of Independence, 540

F.3d 779, 784 (8th Cir. 2008)).  As such, the Court may move directly to the final step of the

McDonnell Douglas analysis—determining whether the employer's legitimate non-retaliatory

reason for termination was pretextual.

### c. Pretext

To sufficiently demonstrate Defendants' proffered non-retaliatory justification is

pretextual, Sellner must demonstrate Defendants' conduct was motivated by retaliatory intent.

Burciaga v. Ravago Ams., LLC, 56 F. Supp. 3d 987, 1002 (S.D. Iowa 2014) (citing Wierman v.

Casey's General Stores, 638 F.3d 984, 999 (8th Cir. 2011)).  That is, Sellner is "obliged to

present evidence that (1) creates a question of fact as to whether [Defendants'] reason was

pretextual and (2) creates a reasonable inference that [Defendants] acted in retaliation."  Stewart

v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1043 (8th Cir. 2007) (internal quotation and

citations omitted); see also Matthews v. Trilogy Commc'ns, Inc., 143 F.3d 1160, 1165 (8th Cir.

1998) (noting that the plaintiff "must do more than simply create a factual dispute as to the issue

of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer

discrimination.").  In evaluating pretext, the Eighth Circuit has cautioned that "[f]ederal courts

do not sit as a super-personnel department that reexamines an entity's business decisions. . . .

Rather, our inquiry is limited to whether the employer gave an honest explanation of its

behavior." Wilking v. Cnty. of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998) (quoting Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 973 (8th Cir. 1994) (quotations omitted)).

### i. Temporal Connection

Sellner argues that pretext is established here in several ways. First, Sellner again focuses on the temporal connection between Stark's comment that he would be "out on the street" if he refused to falsify reports and his eventual termination. But "temporal proximity alone is generally insufficient to prove pretext." Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 978 (8th Cir. 2006). Importantly, "[e]ngaging in protected activity 'does not insulate an employee from discipline for . . . disrupting the workplace.'" Id. (quoting Wallace v. Sparks Health Sys., 415 F.3d 853, 858 (8th Cir. 2005)). Here, several intervening events are evidence that Sellner had disrupted the work place. Nebel received an anonymous email on April 10, 2012 (after the comment by Stark) voicing complaints concerning Sellner's behavior and Schwartz raised issues regarding Sellner's conduct in a meeting on April 17, 2012. The investigation prompted by these reports produced complaints from additional employees. Strong later confirmed to Thomas that Sellner made an offensive statement to him which mirrored the same offensive statement other employees previously alleged Sellner had made—Strong reported that on the trip to China Sellner commented "about how many fingers [a female passerby] would have been." Strong Dep. 28–30. In sum, these intervening events disrupt causal connection between Stark's comment and Sellner's termination.

### ii. Investigation

Sellner further contends that MAT Industries' response to complaints regarding his workplace offensive comments and subsequent investigation was unprecedented and therefore evidence of pretext. Sellner emphasizes the corporate involvement with the investigation,

arguing that "[t]his was the first time Thomas had ever been involved in the termination of a non-management employee and the first time Nebel had ever performed an investigation."  Pl.'s Mem. Opp'n Mot. Summ. J. at 45.  However, the unusual origin of the complaint, an anonymous email which expressed concerns regarding Sanborn's ability to properly conduct an internal investigation, lead to a broad scale response from high levels within MAT Holdings and Industries.  "The appropriate scope of an internal investigation [ ] is a business judgment, and we do not review the rationale behind such a decision."  Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012) (citing Wheeler v. Aventis Pharm., 360 F.3d 853, 859 (8th Cir. 2004)).  Indeed, shortcomings in an investigation, without more, are insufficient to make a showing of pretext.  Id. (citing Roeben v. BG excelsior Ltd. P'ship, 545 F.3d 639, 643 (8th Cir. 2008)).  Accordingly, abnormalities in how the investigation was conducted and any missteps Nebel may have made during the course of the investigation are not evidence of pretext.

### iii.  Similarly Situated Employees

Finally, Sellner maintains that other employees were not disciplined for equally offensive and objectionable conduct.  While "the standard for determining whether employees are similarly situated is rigorous at the pretext stage," it does not require "the plaintiff to produce evidence of a clone."  Burton v. Ark. Sec'y of State, 737 F.3d 1219, 1230–31 (8th Cir. 2013) (citation and quotation marks omitted).  Sellner, however, fails to engage in a full comparator analysis, see e.g., id., instead offering overarching statements that "disturbing information about other employees was completely ignored" and "Defendants have never terminated, nor disciplined, anyone for sexual harassment."  Pl.'s Mem. Opp'n Mot. Summ. J. at 45. Nevertheless, it is clear that the incidences Sellner does identify do not include individuals that were similarly situated to himself and therefore cannot properly be considered as comparator

evidence.

Sellner points to two incidents occurring in Defendants' warehouses in Georgia and California where employees were not disciplined for offensive conduct. Sellner's claim that these employees at the Georgia and California facilities are similarly situated has no merit. The employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Wierman, 638 F.3d at 994 (quoting Cherry v. Ritenour Sch. Dist., 361 F.3d 474, 479 (8th Cir. 2004)). Here, the incidences in Georgia and California are distinguishable. The Georgia complaint related to a female employee taking issue with sexual comments made by male coworkers. MAT Industries did not send a corporate representative to Georgia to investigate in person. No employees were terminated or disciplined for the comments, although sexual harassment training was conducted. But significantly, at the time of the Georgia incident, the individuals responsible for Sellner's termination decision (Thomas, Stark, and Strong) had no decision-making authority in Georgia or any oversight of the employees located there. Nebel Dep. 125. The California incident related to complaints made against a supervisor, but an investigation ultimately determined that the complaints were false. The differences in the supervisor, standards, and conduct in both of the situations precludes their use as "similarly situated" evidence.

Sellner further cites the sexually offensive comments of Knadel and Streich, contending that Defendants failed to act when these employees engaged in comparable conduct. Specifically, Sellner emphasizes Knadel's comment about his daughter and Streich's derogatory remark pertaining to a female manager.

Although highly offensive, these comments are distinguishable from the complaints

pertaining to Sellner and, accordingly, Knadel and Streich cannot be considered as similarly situated. First, Knadel and Streich's comments are not comparable in terms of quantity—multiple complaints were received against Sellner related to his alleged derogatory comments and fellow employees reported several separate incidences of offensive speech. Second, Defendants received multiple complaints on how Sellner's behavior and attitude had an adverse impact on the working environment at Sanborn; Defendants received complaints that (1) Sellner's conduct adversely impacted the lab's work environment; (2) Sellner spoke about other employees in a negative and condescending manner; (3) Sellner failed to maintain productive working relationships with his colleagues; and (4) Sellner's coworkers avoided interacting with him. Sellner has made no effort to show that similar complaints in character and quantity were alleged against Knadel and Streich in addition to their offensive language. Third, it is reasonable to expect that employees with more authority and responsibility will be held to a higher standard of conduct. See Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 917 (6th Cir. 2013) ("Ms. Martinez's role as a manager at Cracker Barrel could reasonably justify holding her to a more stringent standard of conduct than that applied to Ms. Guidry, who holds the position of assistant manager."). When the complaints were made, Sellner was newly assigned as lab leadperson and held a leadership role distinguishable from Knadel and Streich's positions.[6] For all these reasons Sellner has failed to show that Knadel and Streich were similarly situated employees who "engaged in acts of comparable seriousness but [were] disciplined differently." Ridout v. JBS USA, LLC, 716 F.3d 1079, 1085 (8th Cir. 2013) (quotation omitted).

---

[6] Knadel and Streich each applied for the lead lab technician position for which Sellner was selected. Beach Dep. 187–88; Strong Dep. 42. At that time, Knadel was a lab technician and Streich was a quality inspector. Beckman Dep. 23, 89 After Sellner was terminated, Streich moved to a position as a lab technician. Id. at 136–37.

In sum, Sellner has not established that Defendants' proffered reason for his termination was pretextual. Sellner adamantly denies that he engaged in the offensive comments uncovered during the course of the investigation, although he does admit to telling a "story" to Strong about others "guag[ing] women by the number of fingers they are." Sellner Decl. ¶ 54. Sellner further contends that Knadel's complaints were an effort to get him fired. But "[t]he critical inquiry . . . is not whether [Sellner] actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that [he] was guilty of the conduct justifying discharge." Moody v. Vozel, 771 F.3d 1093, 1097 (8th Cir. 2014) (quoting McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 861–62 (8th Cir. 2009)). Sellner has also focused much of his argument on Defendants demanding Sellner falsify reports sent to Sears. Indeed, Sellner may well have raised a genuine fact issue concerning whether Defendants "conducted its business in an objectionable manner."[7] Buytendrop, 498 F.3d at 837. However, that is not the pivotal question for the viability of Sellner's MWA claim. Id. Rather "[t]he relevant question is whether a reasonable jury could find that [Defendants'] proffered reason for the termination was a mere pretext to mask retaliatory animus." Id.

The record here contains numerous indications that Sellner's supervisors were pleased with his work performance as it related to technical matters—he received a glowing job report,

---

[7] Sellner goes to great lengths to emphasize that the data sent to Sears on the Honbase pump was inaccurate and that he was repeatedly asked to falsify data. Sellner's claims were corroborated in only one incident—Stark and Sellner's March 29 conversation overheard by Beach. Beach did not corroborate that Stark told Sellner he would "be on the street," but does allege that Stark made comments regarding "getting creative with the data." Beach Aff. [Docket No. 72] ¶¶ 16–18. In the Court's view requests to "get creative with data" and to "falsify data" are not equivalent. The former could simply be an effort to depict a product in its most favorable light to a potential customer. Nevertheless, as explained above, whether or not such requests were made of Sellner, or the meaning of such requests, is not determinative for the retaliation analysis.

was promoted to the lab lead, his supervisors selected him for the China trip to improve production of the Honbase pump, and he was awarded an above standard pay increase. However, given the results of the investigation and Strong's confirmation that Sellner used language similar to that alleged by other employees in his presence, a reasonable jury could only find that the termination decision was grounded in a good faith belief that Sellner had engaged in inappropriate conduct. Sellner was an at-will employee, and the Court will not second guess Defendants' decision that Sellner's unacceptable conduct directed toward subordinates in the lab outweighed any technical expertise he may have brought to Sanborn. See Brown v. McDonnell Douglas Corp., 113 F.3d 139, 141–42 (8th Cir. 1997) (stating that, absent illegality, the court does "not weigh the wisdom of any particular employment decision." (quotation omitted)). In short, Sellner has failed to present evidence that raises a genuine issue of pretext or retaliatory motive. Sellner's whistleblower claim fails.

### 3. Tort Claims

Sellner additionally asserts several tort claims: (1) defamation; (2) intentional interference with an economic advantage and/or contract; (3) breach of contract; (4) negligent supervision, negligent training, negligent retention, and negligent hiring; and (5) negligence. However, Sellner only opposed Defendants' motion as it pertained to his MWA whistleblower claim and punitive damages. Sellner has therefore abandoned the remaining tort claims due to his failure to respond to Defendants' arguments. Satcher v. Univ. of Ark. at Pine Bluff Bd. Of Trs., 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument").

## B. Motions to Exclude Expert Testimony

Given the Court's above determination that Defendants' are entitled to summary

judgment on all claims, the parties' respective motions to exclude expert testimony are therefore moot.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion for Summary Judgment [Docket No. 157] is **GRANTED**; and

2.     Defendants' and Plaintiff's Motions for Exclusion of Expert Testimony [Docket Nos. 148 and 175] are denied as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 5, 2015.