## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Douglas James Sellner,

                        Plaintiff,                    **MEMORANDUM OPINION
                                                       AND ORDER**
v.                                                     Civil No. 13-1289 ADM/LIB

MAT Holdings, Inc.,
Midwest Air Technologies, Inc.,
MAT Industries, LLC, and
Sanborn Manufacturing Company,

                        Defendants.

_____

Stephen W. Cooper, Esq., and Stacey R. Everson, Esq., The Cooper Law Firm Chartered,
Minneapolis, MN, on behalf of Plaintiff.

Donald M. Lewis, Esq., John J. Wackman, Esq., and Jeremy D. Robb, Esq., Nilan Johnson
Lewis PA, Minneapolis, MN, on behalf of Defendants.

_____

## I.  INTRODUCTION

On November 30, 2017, the undersigned United States District Judge heard oral

argument on Defendants MAT Holdings, Inc., Midwest Air Technologies, Inc., MAT Industries,

LLC, and Sanborn Manufacturing Company's (collectively, "Defendants") Motion for Partial

Summary Judgment [Docket No. 260] and Motion to Exclude Expert Testimony [Docket No.

333].  Plaintiff Douglas James Sellner's ("Sellner") Motion to Exclude Expert Testimony

[Docket No. 341] was also argued.  For the reasons set forth below, Defendants' motions are

granted in part and denied in part.  Sellner's motion is granted.

## II.  BACKGROUND

The factual background of this case is fully recited in this Court's August 5, 2015

Memorandum Opinion and Order [Docket No. 208] and is incorporated here by reference. Sellner alleges that he was terminated from his employment as a Quality Engineering Technician for refusing to falsify testing data for certain models of air compressors.

## A. Defendants

### 1. Corporate Structure

 MAT Holdings, Inc. ("MAT Holdings") is a privately owned holding company owned by Steve Wang ("Wang").  Second Ryan Decl. [Docket No. 263] Ex. 3.[1] It owns companies that manufacture, market, and distribute automotive and consumer business products and brands.  Id. Ex. 1.  MAT Industries, LLC ("MAT Industries") and Midwest Air Technologies, Inc. ("Midwest Air") are two of MAT Holdings' United States subsidiaries.  Id. Ex. 3.

MAT Industries markets air compressors, pneumatic driven air tools, and pressure washers, which are sold by retailers and home centers.  First Ryan Decl. [Docket No. 162] Ex. 2 ("Thomas Dep.") 198.   MAT Holdings performs human resource and administrative work for MAT Industries, for which MAT Industries pays a monthly management fee to MAT Holdings. Second Ryan Decl. Ex. 4 ("Nebel Dep.") 9–10.

In 2008, MAT Holdings purchased a facility in Springfield, Minnesota known as Sanborn Manufacturing ("Sanborn").  Id. Exs. 10 ("Stark Dep.") 14, 54; 11 ("Carnell Dep.") 35–36. MAT Industries refers to the facility as "Sanborn Mfg., a division of MAT Industries, LLC;" however, Sanborn is not itself a legal entity.  Defs.' Joint Separate Answer [Docket No. 104] 1 n.1.  Paul Thomas ("Thomas") serves as MAT Industries' Chief Operating Officer and Butch Stark ("Stark") is Sanborn's General Manager.  Thomas Dep. 7; Stark Dep. 14.

---

[1] The exhibits attached to the Second Ryan Declaration are filed as docket numbers 263 through 332.

### 2. 14CFM Pumps

Sanborn manufactures air compressors ("compressors") with oil-lubricated, single-stage, three-cylinder, 14 cubic-feet-per-minute pumps (the "14CFM pumps"). Second Ryan Decl. Ex. 13 ("Beckman Dep.") 65–68. The compressors operate by a motor driving the pump, which then injects air into a pressure vessel tank. The tank stores the compressed air. Strong Decl. [Docket No. 171] ¶ 2. The amount of air within the tank is controlled by a pressure switch which turns the compressor on and off. Second Ryan Decl. Ex. 24 ("Swanson Dep.") 52–53.

MAT Industries manufactures the tank vessels at Sanborn and purchases the remaining compressor components from third parties. Beckman Dep. 60. In 2007, MAT Industries started purchasing 14CFM pumps from Suzhou Honbase Machinery Manufacture Co. ("Honbase") (the "Honbase pumps") in China. Id. 67–68. Honbase is also owned by Steve Wang. Id.

The Honbase pumps struggled with excessive oil consumption and leakage. Id. Ex. 15 ("Strong Dep.") 92, 97. Sanborn's internal performance and life testing of the Honbase pumps revealed that the pumps did not achieve certain benchmarks set by Sanborn. Second Ryan Decl. Exs. 21–22.

### B. Sellner is Hired

In June 2011, MAT Industries hired Sellner as a lab-quality technician for the Sanborn facility. Id. Ex. 12. Sellner's primary responsibility was to conduct testing in the Sanborn testing lab, to collect corresponding testing data, and report the data to engineers and supervisors. Id. Ex. 27, Interrog. No. 9. Sellner was instructed to report any safety, vendor quality, and manufacturing issues. Id. Travis Strong ("Strong"), MAT Industries' Quality Assurance and Product Service Manager, was Sellner's direct supervisor. Strong Dep. 9; Second Ryan Decl.

Ex. 19 ("Sellner Dep.") 114.

On Sellner's first day at Sanborn, Strong explained to Sellner that the Honbase pumps had serious problems with oil leakage during testing.  Sellner Decl. [Docket No. 184] ¶ 3. Sellner observed oil leaking onto the floor, as well as oil spitting from the pump units during the testing process.  Id.

**C.  Sears and Performance Testing**

In August 2011, MAT Industries and Sears, Roebuck and Company ("Sears") began working together to add a compressor with the Honbase pump to Sears' Craftsman product line. Second Ryan Decl. Ex. 28.  On August 22, 2011, MAT Industries forwarded the raw data from Test Request 136 ("TR136"), performance and life tests that were initiated in late 2010, to Sears' Engineering Manager Dan Swanson ("Swanson").  Id. Ex. 22.  The next day, Chief Operating Officer Thomas wrote an email to Kurt Beckman ("Beckman"), Sanborn's Engineering Manager, and stated that he was "not sure [he] would approve these" based on the amount of oil consumed during testing.  Id. Ex. 29.  Thomas suggested a new round of testing that included pumps with recent changes.  Id.

Sellner was assigned to complete the new test, Test Request 321 ("TR321"), that evaluated whether changes implemented by Honbase improved oil consumption and life performance in the Honbase pumps.  Id. Exs. 34–35.  Performance testing was completed on September 28, 2011.  Id. Ex. 42.  All units passed performance testing.  Id. Exs. 42–43.

Excessive oil leakage, however, remained an issue.  On January 12, 2012, further testing revealed that adding a compression ring to the pump reduced oil leakage.  Id. Exs. 47–48.  MAT Industries required Honbase to add a compression ring on the new pumps, and MAT Industries'

4

existing inventory was re-ringed.  Id. Exs. 49–50.

On February 15, 2012, Swanson asked MAT Industries for additional performance and life test data on the Honbase pump.  Id. Ex. 54.  The test request was directed to Stark, who asked Sellner to assist because he had been assigned TR321.  Stark Dep. 124–125.  On March 2, 2012, Sellner sent Stark an internal Quality Department Laboratory Report ("Quality Report") on TR321 that stated:  1) "[t]ests showed that units passed performance and life testing benchmarks," and 2) the units passed "with minor [n]ormal service issues."  Second Ryal Decl. Ex. 43.  Defendants contend that the life test data in the Quality Report accurately reflects the raw life test data on TR321 listed on a spreadsheet created by Sellner on February 28, 2012. Sellner, however, asserts that the Quality Report does not truthfully reflect the actual testing data to TR321 and that he did not prepare the report.  Id. Ex. 59 ¶ 3.

Using the information from the Quality Report, Stark prepared a Compressor Test Report ("CTR").  Id. Ex. 62.  The CTR summarized that TR321 tested 80-gallon units and concluded that the "pump test samples exceeded minimum [l]ife test requirements set by customer."  Id. Stark forwarded the CTR to Sellner with the instruction to "go through the data I have entered to make sure that I haven't made any mistake."  Id.  Sellner made two edits, and the CTR was sent to Swanson at Sears on March 7, 2012.  Id. Exs. 41, 63.  Sellner contends that the data sent to Sears in the CTR does not accurately reflect the TR321 test results.  First Everson Decl. [Docket No. 206] Ex. 1 ¶ 3; Sellner Dep. 236.

## D.  Request to Falsify Data

On March 29, 2012, Sellner alleges that Stark told him "to get together everything [MAT Industries] had on the [Honbase] pump."  Sellner Dep. 149.  Following those instructions,

Sellner "updated the life test" by collecting all relevant testing results and entering the results into a spreadsheet.  Id.  Sellner delivered the data to Stark.

Sellner alleges later that same day, Engineering Lab Manager Joe Schiller ("Schiller") entered his office with a copy of the spreadsheet Sellner had prepared and stated that the testing results were "shit" and could not be used in any summary report for Sears.  Id. at 150.  Sellner further alleges that shortly thereafter, Stark entered his office and claimed that MAT Industries had been called "on the carpet" by Sears for overstating the performance and quality of the Honbase pump.  Id.  Stark instructed Sellner to produce a report showing that the units did not have major issues and adequately passed life tests of 1,500 hours.  Id.  Sellner claims that when he told Stark that no units had performed to those specifications, Stark responded "well, if you don't do this, we're all going to be on the street—no, you're going to be on the street."  Id. Sellner states that when he told Stark that he would not falsify any testing records, Stark urged him to "get creative with [his] documentation."  Id.

Josh Beach ("Beach") a lab technician, asserts that he overheard portions of this conversation between Sellner and Stark.  Beach recalls hearing Stark telling Sellner that Sears was "calling them on the carpet" for overstating the performance of the Honbase pump, that Stark encouraged Sellner to get creative with testing documentation, and that Sellner refused Stark's command for creativity.  First Ryan Decl. Ex. 86 ("Beach Dep.") at 130, 146–47.  Beach further claims that after the conversation with Stark, Sellner stated, "Well, there's my job."  Id. at 147.

Later that same day, March 29, 2012, Sellner alleges that Stark persisted in pressuring him to complete an Executive Summary with falsified data.  Sellner Decl. ¶¶ 25–30.  Sellner

continued to refuse.  Id. ¶ 35.  According to Sellner, the next day Stark instructed him to use go-cart data[2] for the Executive Summary.  Id. ¶ 39.  Sellner responded that this would not be appropriate.  Id.  Later on March 30, 2012, Sellner called the Minnesota Department of Labor and Industry and the Minnesota Occupational Safety and Health Administration ("MNOSHA").  Id. ¶ 40.  Beach reports that he was in the room with Sellner when he made the call, and that Sellner reported that he was instructed to "doctor up some documentation."  Beach Dep. 49.  Sellner subsequently completed and submitted a MNOSHA form online.  Sellner Decl. ¶ 40.

**E.  Sellner Travels to China**

Sellner was scheduled to travel to China with Strong on April 3, 2012 to evaluate Honbase's operations and implement improvements to the Honbase pump.  Sellner Dep. 123.  The day before their departure, Sellner alleges he received a call from Swanson about Honbase pump data.  Id. at 205.  Specifically, Swanson requested the raw life testing data for the Honbase pump that did not reflect any major issues.  Id. 207–08.  Sellner responded that there was no such data in existence.  Id. at 208.  Swanson then told Sellner that MAT Industries "should have worked the bugs out before it was presented to Sears" and hung up.  Id.  Swanson has no recollection of this conversation with Sellner.  Swanson Dep. 183–84.

While on the plane to China with Strong, Sellner claims that he told Strong about Stark's instruction to provide a falsified report for Sears.  Sellner Dep. 208.  Strong responded that "It would be best if I didn't hear about this" and held his hands up in a gesture for Sellner to stop talking.  Id.  Strong denies this interaction took place.  Strong Dep. 219–20.

While in China, Sellner discovered manufacturing issues with the Honbase pump,

---

[2] "Go-cart" data came from enhanced units with CFM pumps that were altered or tweaked for experimentation purposes.  Pl.'s Mot. Opp'n Summ. J. [Docket No. 190] 16.

including use of pump testing equipment that had not been accurately calibrated.  Sellner Decl. ¶ 9.

## F.  Sellner's Performance Review and Promotion

On March 5, 2012, Sellner received a positive performance review from his immediate supervisor, Strong.  Second Ryan Decl. Ex. 69.  MAT Industries posted a Quality Assurance/Test Lab Leadperson position opening on March 30, 2012.  Id. Ex. 79.  After interviewing Sellner for the position, Strong recommended that Sellner be promoted.  Stark Dep. 43–44.  Strong's recommendation was approved by Stark, and Sellner learned of his promotion just prior to his April 3, 2012 departure to China.  Id.; Sellner Dep. 159.

## G.  Issues in the Sanborn Lab

In the Spring of 2012, tension in the lab was escalating.  On March 7, 2012, lab technician Beach sent Stark and Strong an email expressing his frustration about the working conditions in the lab, specifically noting that Sellner and Clyde Knadel ("Knadel") another lab technician, were "at each other's throats all day here so far and they are dragging me into the situation."  Second Ryan Decl. Ex. 67.  In response, Stark met with Sellner, Knadel, and Beach, and emphasized that they all needed to get along and have a productive working relationship. Beach Dep. 45.

## H.  Investigation of Sellner

On April 10, 2012, while Sellner was still in China, Janis Nebel ("Nebel"), the corporate Director of Human Resources at MAT Holdings, received an anonymous email accusing Sellner of inappropriate conduct and voicing concerns that Sanborn had done nothing to address his behavior.  Second Ryan Decl. Ex. 81.  The email requested that a corporate representative

8

conduct an investigation.  Id.

During an April 17, 2012 meeting, engineer Ryan Schwartz ("Schwartz") told Stark and Sanborn's HR director, Vonda Carnell ("Carnell"), that Seller made derogatory remarks relating to women.  Sellner Dep. 166–68; Carnell Dep. 173–74.  The next day, Carnell and Stark interviewed other employees about Sellner.  Carnell Dep. 180–81. Knadel reported that Sellner had made disparaging comments about female employees.  Second Ryan Decl. Ex. 64 at 376–80.  On April 19, 2012, Schwartz emailed Nebel and notified her that he had complained about Sellner's behavior and requested someone from corporate be involved with investigating his complaint.  First Ryan Decl. Ex. 105.

On April 23, 2012, Nebel traveled to Sanborn to investigate.  Second Ryan Decl. Ex. 4 ("Nebel Dep.") 25.  She did not specifically seek out witnesses, but rather let individuals come to her.  Id. at 40.  During the course of her investigation, Schwartz, Knadel, and others voiced complaints about how Sellner interacted with his coworkers.  Second Ryan Decl. Ex. 91.  These issues included complaints of Sellner being difficult to work with, disregarding safety precautions, and having a condescending attitude toward other employees.  Id.

**I.  Sellner's Termination**

When Nebel returned to her office on April 26, she reported to Thomas that "there was an unproductive work environment now that probably was irreversible" at Sanborn.  Thomas Dep. at 180.  Thomas spoke with Strong and Stark, and it was decided that Sellner would be terminated that day, April 26, 2012.  Id. at 177–81.  MAT Industries maintains that Sellner was terminated for his "unacceptable conduct," including "inappropriate and offensive statements made to and about his colleagues, an inability to maintain positive and productive relationships

with his co-workers, and engaging in conduct that adversely affected the productivity of the workplace." First Ryan Decl. Ex. 30, Interrog. No. 1.

## J. Procedural History

Sellner commenced this lawsuit on May 29, 2013, alleging claims for 1) wrongful termination under the Minnesota Whistleblower Act; 2) defamation; 3) intentional interference with an economic advantage and/or contract; 4) breach of contract; 5) negligent supervision, negligent training, negligent retention, and negligent hiring; and 6) negligence. See Compl. [Docket No. 1].

On October 6, 2014, Magistrate Judge Jeffrey J. Keyes granted Sellner's request to amend the complaint to add a claim for punitive damages. See Min. Entry [Docket No. 96]; Text Only Order [Docket No. 97]. On August 5, 2015, the Court granted summary judgment to Defendants on all claims. See Mem. Op. Order [Docket No. 208]. Sellner appealed the dismissal of his whistleblower claim, and on June 15, 2017, the Eighth Circuit Court of Appeals reversed the dismissal the whistleblower claim and remanded that claim back to this Court. Sellner v. MAT Holdings, Inc., 859 F.3d 610 (8th Cir. 2017). Because Sellner did not appeal the dismissal of his non-whistleblower claims, those claims are no longer part of the case.

## K. Present Motions

### 1. Summary Judgment

#### a. Punitive Damages

Because this Court initially dismissed all of Sellner's claims on summary judgment, Sellner's claim for punitive damages was not addressed. On August 31, 2017, Magistrate Judge

Leo I. Brisbois[3] amended the pretrial scheduling order to permit Defendants to challenge the punitive damages remedy alleged in the Amended Complaint [Docket No. 98] under Federal Rule of Civil Procedure 56. See Order Amending Sixth Am. Pretrial Scheduling Order [Docket No. 250].

Defendants are now moving for summary judgment on Sellner's punitive damages remedy, arguing that the record lacks clear and convincing evidence that Defendants' conduct shows a deliberate disregard for the rights or safety of others.

### b. Dismissal of Some Defendants

Defendants also contend that MAT Holdings, Midwest Air, and Sanborn are not proper defendants to this action and must be dismissed. According to Defendants, Sellner was employed by MAT Industries, and MAT Holdings and Midwest Air are separate legal entities that cannot be held liable for Sellner's alleged unlawful discharge. Defendants contend that Sanborn must be dismissed because it is not a legal entity.

### 2. Expert Testimony

### a. Defendants

Defendants have also filed a motion to exclude the testimony of Sellner's expert witness, Philip J. O'Keefe ("O'Keefe"). Sellner offers O'Keefe as an engineering expert to opine that: 1) oil consumption by the compressor creates fire, explosion, or slip-and-fall hazards; 2) the people who designed the Honbase pump were not qualified engineers; 3) Stark asked Sellner to falsify data; 4) MAT Industries knowingly provided inaccurate data to a customer; and 5) MAT Industries violated certain codes, regulations, and statutes. Defendants contend that O'Keefe's

---

[3] Due to Judge Keyes' retirement, the case was reassigned to Judge Brisbois on July 10, 2017. See Docket No. 226.

11

expert opinions are inadmissible because they are unreliable, unsupported by data or method, and because they invade the province of the jury.

### b. Sellner

Sellner has filed a motion to exclude the expert testimony of Mark Rudek ("Rudek") and John Freeman ("Freeman"). Defendants offer Rudek to provide rebuttal testimony to O'Keefe's opinions regarding alleged violations of codes, regulations, and statutes. Freeman is offered to address Sellner's claims that the compressor presents an unreasonable risk of injury.

## III. DISCUSSION

### A. Summary Judgment

#### 1. Legal Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the nonmoving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

### 2. Punitive Damages

Defendants argue that Sellner's request for punitive damages should be dismissed. Under Minn. Stat. § 549.20, subd. 1, "[p]unitive damages shall be awarded in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." "Deliberate disregard" is defined by statute:

> (b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and;
>
> > (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
> >
> > (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn. Stat. § 549.20, subd. 1(b).

Punitive damages are "an extraordinary remedy to be allowed with caution and within narrow limits." J.W. ex rel. B.R.W. v. 287 Intermediate Dist., 761 N.W.2d 896, 904 (Minn. Ct. App. 2009). On summary judgment, the Court "must ascertain whether a jury could reasonably find that [Sellner] proved his case for punitive damages by the quality and quantity of evidence required by Minnesota law." Kruszka v. Novartis Pharms. Corp., 19 F. Supp. 3d 875, 898 (D. Minn. 2014).

Defendants contend that there is no evidence they deliberately disregarded the rights or safety of Sellner or others. Defendants argue that meeting this standard requires evidence that Defendants knew it was illegal to discharge Sellner for engaging in protected activity, and

despite this knowledge they fired him because he made a report to MNOSHA.  Sellner first disagrees with Defendants' interpretation of the standard for assessing punitive damages, arguing that punitive damages are appropriate because there is evidence that Defendants marketed the Honbase pump with its known consumer safety risks.  Knowledge of these hazards, Sellner argues, provides the basis for awarding punitive damages because it shows Defendants' deliberate disregard for the safety of others.  Sellner additionally argues that even if Defendants' understanding of the standard is correct, punitive damages are nevertheless appropriate because the record reflects that Defendants deliberately ignored Sellner's right to be free from unlawful employment termination.

Whether the Honbase pump's alleged consumer safety hazards is a basis for an award of punitive damages in an employment case is the first point of dispute.  Sellner contends punitive damages are appropriate here because Defendants knowingly placed a defective and dangerous product into the market, exposing consumers to fire, explosion, and slip-and-fall hazards.  However, this is a whistleblower employment case.  In this context, punitive damages are only proper upon a showing of clear and convincing evidence that "Defendants knew of facts or intentionally disregarded facts that created a high probability that [Sellner's] right to be free from retaliatory employment consequences under the whistleblower statute would be injured, and deliberately proceeded to act in conscious or intentional disregard or with indifference to the high probability of such injury."  Korbel v. Extendicare Health Servs., Inc., No. 13-2640, 2015 WL 13651194, at *3 (D. Minn. Jan. 22, 2015); Hern v. Bankers Life Cas. Co., 133 F. Supp. 2d 1130, 1135–36 (D. Minn. 2001); see also Morrow v. Air Methods, Inc., 884 F. Supp. 1353, 1359 (D. Minn. 1995) ("Employees have a right to refuse to follow an order to violate a law without

fear of reprisal.  The deliberate disregard of that right by a defendant, if proved, may warrant an award of punitive damages.").  Accordingly, evidence that the Honbase pump posed a risk to consumer safety is not relevant to determining whether punitive damages are appropriate.

There is, however, sufficient evidence in the record to preserve a claim for punitive damages because a reasonable jury could conclude that the decisionmakers involved in Sellner's termination deliberately disregarded his right to be free from unlawful retaliatory discharge.  Specifically, Nebel, Stark, Strong, and Thomas each played a role in the decision to terminate Sellner, and the record includes evidence that this decisionmaking group had knowledge of Sellner's report to MNOSHA asserting he was being pressured to falsify test results.  For example, Sellner alleges Stark pressured him to falsify data, which Beach corroborated in his deposition testimony.  Sellner Dep. at 150; Beach Dep. at 146–47.  Beach additionally testified that he told Strong that Sellner made a report to MNOSHA about Stark's request.  Second Everson Decl. [Docket No. 360] Ex. 1 [Docket No. 393] at 50–52.  Sellner alleges telling Nebel that he was asked to "fudge test results out of the lab when the units were failing to save the Sears contract."  Sellner Dep. at 222.  Nebel reported the results of her investigation to Thomas, who then spoke with Stark and Strong.  Thomas Dep. at 177–81.  Thomas, Stark, and Strong later decided to terminate Sellner.  Id.

Stark, Strong, and Thomas were high-level employees, and their discharge decision was influenced by Nebel, the Corporate Director of Human Resources.  A jury might reasonably conclude that the decisionmakers knew that Sellner had a right to report a suspected violation of the law—i.e., fabricating test data—without fear of reprisal.  Thus, sufficient evidence exists to allow the jury to decide whether Defendants deliberately disregarded this right and award

punitive damages.

**3. Defendants**

Defendants next argue that MAT Holdings, Midwest Air, and Sanborn are not proper defendants and must be dismissed. According to Defendants, MAT Industries is the only proper defendant here, since it is the legal entity that directly employed Sellner. Sellner argues that although he was directly employed by MAT Industries, there is evidence that MAT Holdings and Midwest Air should remain in this case.[4] MAT Industries, Sellner's employer, holds itself out as being a part of Midwest Air's "family of companies," a group he was explicitly welcomed into when he began his employment. Second Everson Decl. Ex. 13 [Docket No. 368]. Additionally, Sellner contends that Defendants, although separate legal entities, have interrelated operations and common management, as evidenced by the companies' sharing certain human resources and financial services and personnel. Sellner contends that this interrelatedness permits a jury to find each defendant liable for Sellner's illegal discharge under a joint-employer theory.

**a. The <u>Baker</u> Test**

Sellner argues that there are four determinative factors to whether co-defendants are considered single or joint employers:  1) interrelated operations; 2) common management; 3) centralized control of labor relations; and 4) common ownership or financial control. <u>Baker v. Stuart Broad. Co.</u>, 560 F.2d 389, 391 (8th Cir. 1977).[5] Defendants argue that <u>Baker</u> and its

---

[4] Sellner agrees that Sanborn should be dismissed because it is not a legal entity.

[5] Sellner also contends that another test, asking whether "the parent company is linked to the alleged discriminatory action because it controls 'individual employment decisions, can also be used to break-up the corporate independence of the Defendants.'" <u>Brown v. Fred's, Inc.</u>, 494 F.3d 736, 739 (8th Cir. 2007) (quoting <u>Leichihman v. Pickwick Int'l</u>, 814 F.2d 1263, 1268 (8th Cir. 1987)). Rather than being an independent test, as urged by Sellner, the Eighth Circuit stated

progeny do not apply here because they were decided in the Title VII context, which "use[s] a broader definition of employer than appears in the Minnesota whistleblower statute." Obst v. Microtron, Inc., 588 N.W.2d 550, 554 (Minn. Ct. App. 1999), aff'd, 614 N.W.2d 196 (Minn. 2000), superseded on other grounds as stated in Friedlander v. Edwards Lifesciences, LLC, 900 N.W.2d 162 (Minn. 2017).

Despite the more expansive definition of "employer" in Title VII, the Baker test is still appropriate here. The Minnesota Supreme Court has interpreted Minnesota employment statutes in light of the United States Supreme Court's interpretation of Title VII. LaMont v. Indep. Sch. Dist. No. 728, 814 N.W.2d 14, 21 (Minn. 2012); Chavez-Lavagnino v. Motivation Educ. Training, Inc., 767 F.3d 744, 749 (8th Cir. 2014). Title VII and Minnesota's whistleblower statute use similar language to protect employees from prohibited workplace conduct. This shared language and intention supports interpreting the two statutes with some degree of harmony.[6]

Additionally, the Baker test was applied in a Minnesota whistleblower case where an employee alleged engaging in protected conduct with respect to one employer and was later terminated by another employer operating within the same corporate structure. Krutchen v. Zayo Bandwidth Ne., LLC, 591 F. Supp. 2d 1002, 1014 (D. Minn. 2008). Although the circumstances

---

that "Brown should not be read as establishing a new integrated enterprise test in our circuit." Sandoval v. Am. Bldg. Maint. Indus., Inc., 578 F.3d 787, 796 (8th Cir. 2009). The Sandoval court continued by noting that Brown "may be harmonized with Baker by noting the traditional four-factor standard is the means by which plaintiffs demonstrate corporate dominance over a subsidiary's operations and establish affiliate liability." Id.

[6] The Court is unaware of any case involving the Minnesota whistleblower statute or the Minnesota Human Rights Act—Minnesota's primary statute proscribing certain employment practices—holding that "employer" should be defined narrowly.

here do not squarely overlap with <u>Krutchen</u>—the plaintiff there was not terminated by the same company he blew the whistle on—that slight difference is not significant, especially considering that Nebel, whose investigation informed the discharge decision, was employed by a different Defendant than Sellner.[7]  In sum, Title VII's broad use of "employer," by itself, is not grounds to jettison the <u>Baker</u> test in this whistleblower case.

Having concluded the <u>Baker</u> test is appropriate to use in this context, two additional considerations are important.  First, the environment in which the <u>Baker</u> factors function is colored by a presumption of corporate separateness.  "In situations where the court is asked to disregard the separate and distinct form of legal entities, the standards are narrow and rigorous, imposing a presumption of corporate separateness."  <u>Davis v. Ricketts</u>, 765 F.3d 823, 827 (8th Cir. 2014); <u>Robinson v. Terex Corp.</u>, 439 F.3d 465, 468 (8th Cir. 2006) (noting that, in the context of a parent-subsidiary relationship, "[s]eparate corporate entities should be disregarded only when there is some abuse of the privilege to operate as separate corporations to the detriment of a third party").  Second, no one factor is more determinative than the others.  <u>See</u> <u>Baker</u>, 560 F.2d at 392 (intimating that "no one of the enumerated factors is controlling").

**b. Analysis**

The interrelation of operations factor "considers sharing services such as check writing, preparation of mutual policy manuals, contract negotiations, completion of business licenses, sharing payroll and insurance programs, sharing services of managers and personnel, sharing office space, equipment, and storage, and operating the entities as a single unit."  <u>Sandoval</u>, 578

---

[7] The Maine Supreme Court found no clear error with applying the four factor test in a case involving the Maine Whistleblowers' Protection Act.  <u>Batchelder v. Realty Res. Hosp., LLC</u>, 914 A.2d 1116 (Maine 2007).

F.3d at 793.  Here, Sellner and his direct supervisors are employed by MAT Industries.  Each Defendant operates in a separate business space; MAT Industries' business is primarily hardware, whereas Midwest Air Technologies manufactures fencing, lawn, and garden accessories, and pet containment and other pet accessories.  MAT Holdings does not directly sell consumer products.  There is some evidence that certain employees perform work for multiple Defendants.  For example, Nebel is an employee of MAT Holdings, but she investigated Sellner's workplace conduct.  Moreover, MAT Industries' handbook referred to all Defendants and welcomed Sellner "to the Midwest Air Technologies' family of companies."  There is some evidence that Defendants' operations are interrelated.  MAT Holdings performs certain human resources functions for MAT Industries, for which MAT Industries pays a monthly management fee for the service.  Despite this evidence, the interrelation of operations factor does not weigh convincingly in favor of destroying Defendants' corporate independence.  See Davis, 765 F.3d at 827–28 (maintaining corporate separateness despite parent company providing "accounts payable, accounts receivable, payroll administration, benefits coordination, and some legal and human resource services" to subsidiary).

The common management factor "includes whether the same individuals manage or supervise the different entities or whether the entities have common officers and boards of directors."  Sandoval, 578 F.3d at 793.  The record reflects that although Wang is the sole owner of each of the Defendants, each Defendant functions with an independent management team that makes independent day-to-day decisions.  The record does not include evidence that MAT Industries' business decisions are made by anyone other than its own management team.[8]  The

---

[8] Sellner argues that MAT Industries' selection of Honbase as its manufacturer of

management of MAT Industries is sufficiently autonomous and free from direction and oversight from any other Defendant to find that this factor favors maintaining corporate separateness.  See Davis, 765 F.3d at 828 (noting that, although parent and subsidiary shared common ownership, there was "no evidence that the same persons were involved in management of the two entities").

Davis is also instructive for the centralized control of labor relations factor.  In Davis, the common owner of both the parent company and its subsidiary was involved in the labor relations for both entities, but final decisions regarding the subsidiary's employment matters were independently made by the subsidiary.  Id. at 828–29.  Here, although Nebel was involved in Sellner's investigation, the investigation informed the discharge decision that was ultimately made by Thomas with input from Strong and Stark.  Accordingly, this factor does not favor disrupting the separation of Defendants' corporate structure.

The final factor, the degree of common ownership or financial control, considers "whether one company owns the majority of all shares of the other and if the entities share common officers or directors."  Sandoval, 578 F.3d at 793.  The record here shows that Defendants are all owned by the same individual.  The record further reflects that there is some degree of financial commingling, in light of Midwest Air issuing the payroll checks and W-2s for employees of MAT Holdings.  But the record also includes evidence that Defendants maintain some degree of financial independence from one another, as evidenced by the monthly management fee MAT Industries pays to MAT Holdings for performing certain human resource functions.  The evidence relevant to this factor gives slight support to Sellner's argument that the

---

compressor pumps indicates that Wang controls its business decisions, since Honbase is also owned by Wang.  There is no evidence, however, that Wang ordered this decision or required MAT Industries to use Honbase.

Defendants should be treated as a single entity.

Sellner has produced evidence establishing common control and some degree of financial overlap.  Sellner can also point to evidence showing a slight amount of operational interrelation.  However, as was true in <u>Davis</u>, this is insufficient to overcome the presumption of treating separate corporate entities separately.  765 F.3d at 829.  The record reflects each Defendant made day-to-day business decisions independent from the other Defendant companies, and were managed by employees working for one company rather than all Defendants.  Dismantling the Defendants' corporate structure demands stronger evidence than what is in the record.  Accordingly, MAT Holdings and Midwest Air are dismissed as defendants.

**B.  <u>Daubert</u> Motions**

Sellner and Defendants have each proffered expert witnesses to testify at trial.  Both Sellner and Defendants argue that the opposing party's experts should not be permitted to testify.

### 1.  Legal Standard

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

When evaluating the admissibility of expert testimony, a trial court serves as the gatekeeper to ensure that the proffered testimony is reliable and relevant.  <u>Daubert v. Merrell</u>

Dow Pharms., Inc., 509 U.S. 579, 589 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S.

137, 141 (1999).  A trial court has broad discretion in fulfilling its gatekeeping role.  Wagner v.

Hesston Corp., 450 F.3d 756, 758 (8th Cir. 2006).  The proffered testimony must be useful to the

fact-finder, the expert must be qualified, and the proposed evidence must be reliable.  Lauzon v.

Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  The proponent of the expert testimony

bears the burden of showing by a preponderance of the evidence that the testimony is admissible.

Id.

      "[R]ejection of expert testimony is the exception rather than the rule," and expert

testimony should be admitted if it "advances the trier of fact's understanding to any degree."

Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006).  "As a general rule, the

factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility,

and it is up to the opposing party to examine the factual basis for the opinion in cross-

examination."  United States v. Finch, 630 F.3d 1057, 1062 (8th Cir. 2011) (internal quotations

and alterations omitted).  "Only if the expert's opinion is so fundamentally unsupported that it

can offer no assistance to the jury must such testimony be excluded."  Bonner v. ISP Techs., Inc.,

259 F.3d 924, 929-30 (8th Cir. 2001).  Doubts about the usefulness of an expert's testimony

should generally be resolved in favor of admissibility.  Marmo v. Tyson Fresh Meats, Inc., 457

F.3d 748, 758 (8th Cir. 2006).

    **2.  Analysis**

      **a.  Defendants' Motion**

    Sellner proffers O'Keefe to render an expert opinion that:  1) oil consumption by the

compressor creates fire, explosion, or slip-and-fall hazards; 2) the people who designed the

Honbase pump were not qualified engineers; 3) Stark asked Sellner to falsify data; 4) MAT Industries knowingly provided inaccurate data to a customer; and 5) MAT Industries violated certain codes, regulations, and statutes.  Defendants argue that O'Keefe's testimony must be rejected in its entirety.

Sellner, in support of admitting O'Keefe's opinions, responds that Defendants are ignoring the two core issues in the case:  "1) what did the Honbase 14-cfm-pump testing data from 2010-2012 reveal; and 2) was that data accurately presented to retailers."  Pl.'s Mem. Opp'n Mot. Exclude Expert Test. [Docket No. 359] 1.  According to Sellner, "[t]he issue here is not whether someone suffered bodily injury as a result of Defendants' negligence, the issue is what did the testing information reveal and was it accurately communicated to retailers."  Id. at 12.  Sellner's "core issues" are not at the heart of this case.  This is a whistleblower case, and the Eighth Circuit's opinion in this case directly conflicts with Sellner's framing of the issues.  In remanding this case, the Eighth Circuit stated "[t]he issue is the causal connection between Sellner's protected conduct and his firing."  Sellner, 859 F.3d at 614.  Recovering under the Minnesota whistleblower statute requires Sellner to prove that MAT Industries "took adverse employment action against [him] because []he engaged in statutorily protected conduct, here, making a good faith report of suspected violation of law."  Fjelsta v. Zogg Dermatology, 488 F.3d 804, 808 (8th Cir. 2007).  Critically, "[a]n employee alleging retaliation need not show that the alleged conduct was actually unlawful, only that the employee 'in good faith, reported a violation or suspected violation of law to an employer.'"  Sellner, 859 F.3d at 614 (quoting Pedersen v. Bio-Med. Applications, 775 F.3d 1049, 1053 (8th Cir. 2015)).  In Minnesota, falsifying test data violates the law; reporting it is protected conduct under the whistleblower

23

statute.  <u>See</u> Minn. Stat. § 325D.44; Minn. Stat. § 181.932.

In this context, some of O'Keefe's testimony is irrelevant because it will not aid the jury in determining whether MAT Industries "took adverse employment action against [Sellner] because []he engaged in statutorily protected conduct." <u>Fjelsta</u> 488 F.3d at 808.  The alleged fire, explosion, and slip-and-fall hazards have no bearing on that determination.  Similarly, the qualifications of the engineers at the Honbase facility are irrelevant to Sellner's discharge.  Likewise, whether MAT Industries followed industry codes and regulations for testing the Honbase pump does not impact the legality of Sellner's discharge.  Rule 702 permits inclusion of expert opinion testimony if it is "useful to the finder of fact in deciding the ultimate issue of fact." <u>Lauzon</u>, 270 F.3d at 686 (citation omitted).  This evidence does not meet this requirement.

Even if this evidence were somehow relevant to deciding the legality of Sellner's discharge, it must be excluded under Federal Rule of Evidence 403:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403; <u>United States v. Solorio-Tafolla</u>, 324 F.3d 964, 966 (8th Cir. 2003) ("Even so, under <u>Daubert</u> and Rule 403 of the Federal Rules of Evidence, the probative value of the expert testimony must not be substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury.").  The Eighth Circuit has stated that "Rule 403 'does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case.  The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis.'" <u>United States v. Myers</u>, 503 F.3d 676, 682 (8th Cir.

2007) (quoting Wade v. Haynes, 663 F.2d 778, 783 (8th Cir. 1981)).  The Advisory Committee

Notes to Rule 403 explain that a decision on an "improper basis" is "commonly, though not

necessarily, an emotional one."  Fed. R. Evid. 403, Advisory Committee Notes; see also United

States v. Bell, 761 F.3d 900, 912 (8th Cir. 2014) (same).

Here, any probative value of O'Keefe's testimony regarding alleged safety hazards, the

qualifications of the Honbase engineers, and whether MAT Industries violated certain codes,

regulations, or statutes, is significantly overshadowed by its prejudice.  As discussed above, the

alleged fire, explosion, and slip-and-fall hazards of the Honbase pump have no direct bearing on

whether Sellner was terminated for making a report to MNOSHA.  However, if this testimony is

admitted, a juror's opinion of Sellner's discharge will likely be influenced by antipathy towards

Defendants for pushing a product to market that allegedly posed a danger to consumers.

O'Keefe's testimony regarding the quality of the engineers at the Honbase facility is similarly

problematic.  A juror who hears testimony that Defendants employed inexperienced foreign

engineers to manufacture a defective and dangerous product for American consumers might be

guided by an emotional response rather than the facts surrounding Sellner's discharge.

O'Keefe's other opinions must also be excluded.  Sellner seeks to introduce O'Keefe's

opinions that MAT Industries told Sellner to fabricate data, and that the data MAT Industries

provided to Sears was inaccurate.  O'Keefe opines that Defendants pressured Sellner to falsify

test data to save or obtain sales from Sears and other retailers.  Lindeman Decl. [Docket No. 336]

Ex. 17 at ¶ 74.  But O'Keefe's opinion on this point is solely derived from reading non-technical

record evidence and crediting one witness over another.  At trial, the jurors will hear competing

testimony from Sellner and Stark regarding Sellner's allegation that Stark pressured him to

falsify testing data.  The jury will be able to draw its own conclusion about whether Sellner was requested to fabricate data, a non-technical conclusion that does not need expert testimony.[9] See, e.g., Ellis v. Miller Oil Purchasing Co., 738 F.2d 269, 270 (8th Cir. 1984) ("Where the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous.") (per curiam).  Permitting the jury to hear O'Keefe's testimony would mainly serve to bolster Sellner's credibility, amplifying Sellner's depiction of their encounter over Stark's. This evidence is inadmissible in this context.  See Am. Auto. Inc. Co. v. Omega Flex, Inc., 783 F.3d 720, 725 (8th Cir. 2015) ("[C]ourts must guard against invading the province of the jury on a question which the jury was entirely capable of answering without the benefit of expert opinion.").

The jury must also not consider opinion testimony regarding whether the figures MAT Industries provided to Sears were actually fraudulent.  Sellner, 859 F.3d at 614 (noting that "[a]n employee alleging retaliation need not show that the alleged conduct was actually unlawful"). Accordingly, the truth or falsity of the figures does not weigh into whether Sellner's discharge was illegal under the whistleblower statute, which protects an individual from retaliatory discharge if they, "in good faith, report[ ] a violation or suspected violation of law." Id. (quotation marks omitted).

In remanding this case, the Eighth Circuit framed the remaining issue for trial:  whether MAT Industries "took adverse employment action against [Sellner] because []he engaged in statutorily protected conduct, here, making a good faith report of a suspected violation of law."

---

[9] The value of this testimony is further eroded because Sellner does not need to establish that Defendants actually asked him to violate the law.  As stated above, to prevail on his claim Sellner only needs to prove that he "in good faith, reported a violation or suspected violation of law."  Sellner, 859 F.3d at 614 (quotation marks omitted).

Id. (quotation marks omitted).  For the reasons explained above, O'Keefe's expert opinions must be excluded.

### b.  Sellner's Motion

Sellner seeks to exclude the testimony of Defendants' expert witnesses, Rudek and Freeman.  Sellner argues that Rudek and Freeman lack the required experience and training to render an expert opinion in this case.  Sellner additionally argues that Rudek and Freeman did not perform relevant testing, their conclusions are not premised on sufficient facts and data, and that their methodology is contrary to recognized scientific principles.  Defendants respond that their experts' opinions are responsive to O'Keefe's proposed testimony; Freeman is proffered to rebut O'Keefe's opinions regarding the Honbase pump's alleged safety issues, and Rudek is proffered to address O'Keefe's claim that Defendants violated law and regulations.

At the hearing, Defendants stated that they would withdraw Freeman and Rudek if O'Keefe's testimony was excluded.  Defendants reasoned that because this case turns exclusively on whether Sellner was discharged for engaging in protected activity, experts are not needed for the jury to make that determination.  The Court agrees.  The jury is well-equipped to decide if MAT Industries discharged Sellner because he reported to MNOSHA that he was being asked to fabricate testing data without the aid of expert testimony.  The introduction of expert testimony will obscure the true issue in this case, and may result in a verdict that is tainted by emotion and bias.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

27

1.     Defendants MAT Holdings, Inc., Midwest Air Technologies, Inc., MAT
       Industries, LLC, and Sanborn Manufacturing Company's Motion for Partial
       Summary Judgment [Docket No. 260] is **GRANTED IN PART and DENIED
       IN PART**:

       A.     Defendants' Motion is **DENIED** with respect to punitive damages;
       B.     Defendants' Motion is **GRANTED** with respect to dismissing Defendants.
              Defendants MAT Holdings, Inc., Midwest Air Technologies, Inc., and
              Sanborn Manufacturing Company are dismissed.

2.     Defendants' Motion to Exclude Expert Testimony [Docket No. 333] is
       **GRANTED**; and

3.     Plaintiff Douglas James Sellner's Motion to Exclude Expert Testimony [Docket
       No. 341] is **GRANTED**.

                                              BY THE COURT:


                                              ____s/Ann D. Montgomery_____
                                              ANN D. MONTGOMERY
                                              U.S. DISTRICT JUDGE

Dated:  February 8, 2018